UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE MIGUEL ALVAREZ,<br><br>Defendants. | No. 1:15-cr-00346-DAD-BAM<br><br>ORDER DENYING MOTION TO SUPPRESS<br><br>(Doc. No. 20) |

On March 21, 2016, defendant filed a motion to suppress all evidence seized as a result of a traffic stop and subsequent search, both of which he contends were unlawful. (Doc. No. 20.) The government opposed the motion on April 4, 2016. (Doc. No. 21.) A reply was filed on May 30, 2016. (Doc. No. 24.) The motion was then taken under submission. For the reasons set forth below, defendant's motion to suppress will be denied.

**Evidence**

Defendant Alvarez was indicted on December 10, 2015 on one count of possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), following his arrest on November 22, 2015. (Doc. No. 7.) The charge brought against defendant Alvarez stemmed from the stop and subsequent search of a vehicle he was driving by a California Highway Patrol (CHP) Officer Lloyd Pratt. Pursuant to the challenged search approximately eight pounds of methamphetamine were discovered in the trunk of the vehicle.

1

The defense moved for an evidentiary hearing in connection with the pending motion to suppress evidence and that request was granted. An evidentiary hearing was conducted on July 7, 2016, at which Officer Pratt and Federal Public Defender Investigator Shawn McElroy testified.[1] (Doc. No. 28.) CHP Officer Pratt testified as follows.

Officer Pratt was a sergeant with the CHP in Madera at the time of defendant Alvarez's arrest. (Doc. No. 32 at 5.) For six and half years prior to his promotion to sergeant he had served with a CHP canine unit responding to calls and conducting canine assisted searches including those related to drug interdiction. (Doc. No. 32 at 6, 8–9.) As a result, he had received extensive training and made hundreds of arrest of those transporting currency and narcotics. (*Id*.) He had also made hundreds of arrests for driving under the influence (DUI), especially during the first five years of his career when he was assigned to the graveyard shift, the primary focus of which is DUI enforcement. (*Id.* at 7.)

At approximately 11:57 p.m. on the Saturday night in question, Officer Pratt was ending his shift and driving home northbound on Highway 99[2] when he saw a Chevy Malibu driving ahead of him travelling at 60 mph in a 65 mph zone and began to follow it. (*Id.* at 11, 22–23, 29,

/////
/////
/////
/////
/////
/////
/////

---

[1] Investigator McElroy testified merely for purposes of admitting into evidence an Ipad video he had taken from his car of the stretch of Highway 99 in question and a Google Earth aerial photo of the same. (Id. at 62–67.)

[2] The CHP vehicle driven by Officer Pratt was one of only two (out of twelve) Madera CHP patrol cars not outfitted with a Mobile Video Audio Recording System (MVRS). (Id. at 26–29.) Accordingly, there is no video of his observations, the vehicle stop itself, or of what occurred thereafter. As a sergeant, Officer Pratt's primary duty was field supervision but if he did not have anything to do, he would go out on patrol. (*Id*. at 28.)

33.)[3] For the first ten seconds he followed the defendant's car, Officer Pratt "didn't see anything really." (*Id.* at 53.) However, during the next ten seconds the Malibu proceeded into a turn and drifted onto the shoulder of the highway by crossing the white line by approximately ten inches and driving onto the rumble strip, corrected by jerking back into the right lane, then moving back to the outer white lane line again after a few seconds, and driving on that line for 50 to 100 feet before pulling back into the right lane. *(Id.* at 11, 34, 52–53, 55–56, 60.)[4] Officer Pratt believed it was significant that the vehicle drifted over the line while navigating a curve because, in his experience, the reactions of DUI drivers are impaired causing them to be slow to react to a curve in the road and causing them to often drift without being able to react in time to make the turn properly. (*Id.* at 11–12, 54.) Officer Pratt believed that the vehicle correcting and then touching and driving on the lane line again was also indicative of possible driver impairment. (*Id.* at 12, 54–55.) Officer Pratt

/////

/////

---

[3] As the following exchange establishes, Officer Pratt had no particular reason to follow the car in question:

> Q. What first drew your attention to the Chevy Malibu?
>
> A. What first drew my attention was the taillights. I – I'm the type of officer that -- or now sergeant, I guess, I enjoy my job. And I actually passed up my offramp to go look at this vehicle. Because I saw the taillights.
>
> Q. What was distinctive about the taillights that made you want to investigate further?
>
> A. Nothing. There was -- I enjoy my job. I enjoy making stops. And I -- there was a set of taillights in front of me and I kept going past my offramp that I actually live at to look at the vehicle.

(*Id.* at 31.)

[4] According to Officer Pratt, it is appropriate to conduct a stop to investigate suspected driving under the influence very quickly so as to prevent the risk of an accident occurring rather than following the suspect vehicle for a greater distance. (*Id.* at 52, 54–55.)

3

then initiated a vehicle stop and contacted the driver with the intent to determine his sobriety. (*Id*. at 11.)[5]

Officer Pratt contacted the driver and sole occupant of the Malibu, defendant Alvarez, and advised him that he had been pulled over because he had weaved off the road. (*Id*. at 38.) The driver acknowledged he had weaved off the road, explaining that he had done so because he was tired. (*Id*.) Alvarez also stated he did not have a driver's license because it had been suspended due to a prior DUI conviction. (*Id*. at 13.) As Officer Pratt spoke to defendant Alvarez he observed no objective symptoms of his intoxication: his eyes were not red and watery, his speech was not slurred, and there was no odor of alcohol emitting from inside the car. (*Id*. at 13, 17–18, 59.) Officer Pratt never asked Alvarez whether he had been drinking. (*Id*. at 38.) Nonetheless, Officer Pratt concluded within a minute or so of making contact with him that Alvarez was not under the influence and therefore saw no need to administer field sobriety tests. (*Id*. at 38, 58.) However, as they spoke, Officer Pratt perceived several indicators of criminal activity. (*Id.* at 14, 19.)

First, when Alvarez provided registration and insurance information Officer Pratt noted that the registration was in the name of someone from Keyes and the insurance was in the name of someone from Modesto, neither of whom was Alvarez. (*Id*.) In Officer Pratt's training and experience in drug interdiction, this circumstance was indicative of activity by a drug cartel. (*Id*.) Moreover, and of significance to Officer Pratt, when asked to identify the owner of the car he was driving, defendant Alvarez could not provide a name, thereby indicating criminal activity. (*Id*. at 15.) In addition, there was a single key in ignition, a cell phone in the center divider and convenience store items on the front passenger seat, all of which considered together indicated to

---

[5] Officer Pratt testified that there was a bar in the area and it was the time of night when more people left bars and DUI activity increased. (*Id*. at 11.) Moreover, there had been a fatal DUI collision at this same curve two months earlier and a number of DUI arrests associated with a bar one mile south of this location. (*Id*. at 12–13.) Officer Pratt had contacted Alcoholic Beverage Control to investigate overserving at the bar. (*Id*. at 13.) Officer Pratt testified: "I know it seems kind of crazy, but I'm one of those guys that I really enjoy arresting people and taking people off the road. And that was – my purpose was to catch up to that vehicle and look at it and see if there was a violation of the law. I love what I do." (*Id*. at 53.)

Officer Pratt that Alvarez was transporting narcotics. (*Id*. at 14–15.)  Accordingly, Officer Pratt asked Alvarez to exit the car and directed him to the front of his patrol car as he ran Alvarez's license and registration.  (*Id*. at 16, 18.)[6]  At the same time Officer Pratt asked CHP dispatch to also run a check with the El Paso Intelligence Center (EPIC).  (*Id*. at 38.)[7]

As they continued to speak, Alvarez told Officer Pratt that his uncle had arranged the use of the car for him but he did not know the owner's name or the name of the person who brought the car to him.  (*Id*. at 20.)  Alvarez was not even sure of his own uncle's name, explaining that they referred to the uncle only by his nickname.  (*Id*.)  When asked where he was coming from, Alvarez stated he was coming from Porterville where he had visited his aunt but was unable to identify where in Porterville his aunt, whom he had allegedly just visited, lived.  (*Id*. at 21.)  Alvarez's statements in this regard were also indicators of criminal activity to Officer Pratt.  (*Id*.)  After confirming Alvarez's license was suspended as he had stated, Officer Pratt observed that Alvarez appeared to be very nervous:  continuously talking and offering to hold the officer's flashlight while a citation for driving on a suspended license due to a DUI conviction was being written.  (*Id*. at 22.)

After he wrote the citation Officer Pratt shook hands with Alvarez and told him he was free to leave.  (*Id*. at 23.)[8]  However, as Alvarez walked away Officer Pratt asked him if there

/////

---

[6] Officer Pratt first testified that his initial assessment that Alvarez was not intoxicated was based, in part, on the fact that Alvarez was steady on his feet when he exited the vehicle. (*Id*. at 13.) He later testified that he did not observe Alvarez to be steady on his feet until later—after he had already decided Alvarez was not intoxicated and after he formed the suspicion that drugs were being transported in the vehicle. (*Id*. at 16–17, 39–40.)

[7] Officer Pratt believed that CHP dispatch responded on the registration and suspended license check within approximately three minutes of his call and that the response to his EPIC inquiry took another three to four minutes thereafter. (Id. at 43.)

[8] As Officer Pratt readily admitted, this was a tactic employed by him to try and obtain Alvarado's consent to search. (*Id*. at 45–46.) The theory behind the tactic was that if a suspect believes he is going to be allowed to drive away, he is more likely to consent to a search. (*Id*.) In fact, Officer Pratt had no intention of allowing Alvarado to drive away, because his driver's license was suspended and it would be illegal and dangerous to walk along the highway. (*Id*.)

were large amounts of money, weapons or drugs in his car. (*Id*. at 24.)[9] When Alvarez responded there was not, Officer Pratt asked for his consent to search the car, to which Alvarez responded "yes." (*Id*.) As Officer Pratt filled out a consent form, Alvarez asked if he was required to let the officer search the vehicle, to which Officer Pratt replied that it was Alvarez's constitutional right to decline to consent to the search. (*Id*.) When Alvarez stated that the officer would search the car anyway, Officer Pratt replied that was "not true." (*Id.*) When Alvarez asked what the officer would do if he refused to consent to a search, Officer Pratt advised he would call a canine unit to the scene. (*Id.*) At that point, Alvarez again consented to the search of the car and signed the consent form prepared by Officer Pratt. (*Id.* at 24–25, 47.) After the consent form was signed, Officer Pratt told Alvarez that he, Pratt, was really good at narcotics interdiction, knew there were drugs in the car, was going to find them and that he was going to give Alvarez one chance to tell the truth and then "all bets were off." (*Id*.) Alvarez then confirmed that there were drugs in a bag in the trunk of the vehicle and Officer Pratt arrested him. (*Id*. at 25.) A subsequent search of the trunk revealed a black plastic bag containing approximately eight pounds of methamphetamine. (*Id.*)

**Legal Standard**

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Traffic stops, "even if only for a brief period and for a limited purpose," are "seizures" within the meaning of the Fourth Amendment, and therefore are "subject to the constitutional imperative that [they] not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). "A police-initiated traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a 'reasonable suspicion' that the vehicle's occupants have broken a law." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *see also United States v.*

---

[9] This was another tactic, one Officer Pratt had learned during his drug interdiction training, as a means of obtaining consent to search, thereby strengthening a future prosecution and protecting against a potential defense motion to suppress evidence. (*Id*. at 23–24, 46.)

*Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000). An officer making a traffic stop "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity," in light of the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Navarette v. California*, ___U.S.___, ___, 134 S. Ct. 1683, 1687 (2014); *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). The reasonable suspicion standard is intentionally abstract, and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *Arvizu*, 534 U.S. at 273–77; *see also United States v. Hartz,* 458 F.3d at 1017 ("Reasonable suspicion exists if 'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity.") (quoting *Lopez–Soto*, 205 F.3d at 1105.).

**Analysis**

Defendant Alvarez advances three main arguments in support of his motion to suppress the evidence seized from the vehicle he was driving: (1) Officer Pratt lacked reasonable suspicion to initiate the traffic stop; (2) Officer Pratt unreasonably prolonged the stop; and (3) Officer Pratt conducted a warrantless search of the vehicle. (Doc. No. 20.) Below, the court addresses each of these arguments in turn.

*1. Reasonable Suspicion of Driving While Intoxicated to Initiate a Traffic Stop*

In arguing that Officer Pratt lacked reasonable suspicion to initiate the traffic stop, defendant relies primarily on the decision in *United States v. Colin*, 314 F.3d 439 (9th Cir. 2002). There is good reason for the defense to place its reliance there because the facts of this case are quite similar to those confronted by the Ninth Circuit in *Colin*. In that case, the officer

> observed the car drift onto the solid white fog line on the far side of the right lane and watched the car's wheels travel along the fog line for approximately ten seconds. The Honda then drifted to the left side of the right lane, signaled a lane change, and moved into the left lane. [The officer] next observed the car drift to the left side of the left lane where its left wheels traveled along the solid yellow line for approximately ten seconds. The car then returned to the center of the left lane, signaled a lane change, and moved into the right lane. [The officer] pulled the car over for possible violations of California Vehicle Code § 21658(a) (lane straddling) and California Vehicle Code § 23152(a) (driving under the influence).

314 F.3d at 441.

7

Based upon these facts, the Ninth Circuit in *Colin* reversed the denial of the defendant's motion to suppress methamphetamine seized from the car, concluding that the officer lacked sufficient cause to initiate a vehicle stop. 314 F.3d at 443–46. Specifically, the court concluded that the observations of the officer did not establish reason to believe there had been a violation of the California law prohibiting lane straddling because the vehicle was not observed crossing a lane line and "[i]t is reasonable that a driver with no cars abreast of him might veer slightly within his lane or over the lane line in the course of making a lane change to ensure that it is safe to do so." *Id*. at 445. In rejecting reasonable suspicion justifying a vehicle stop for violation of driving under the influence, the Ninth Circuit noted:

> [The Officer] testified that he observed[the] vehicle for 35–45 seconds before pulling it over, and that during this time, Estrada–Nava drove within the speed limit and properly activated his turn signals before making lane changes. [The officer] thought Estrada–Nava was "possibly" driving under the influence because the car's wheels touched the fog line on the right side of the right lane for 10 seconds and then, about 5–10 seconds later, touched the yellow line on the far left of the left lane for another 10 seconds.

*Id*. at 445. Comparing these observations with those considered by California courts as well as the courts of other states in assessing reasonable suspicion for driving under the influence, the court in *Colin* concluded that in the case before it, reasonable suspicion was lacking because the officer did not observe "pronounced weaving" by the vehicle within a lane nor such in-lane weaving over a substantial distance (since it was only 35-45 seconds in length) and that merely touching the right fog line and the yellow center line for 10 seconds after legitimate and lawful lane changes did not establish otherwise. *Id*. at 445–46. Before concluding that reasonable suspicion was lacking, the court also noted it was curious that upon stopping the vehicle the officer did not ask the driver if he'd been drinking or administer a field sobriety test. *Id*. at 446.[10] *See also United States v. Bell*, Case. No. 13-cr-0287-JST-1, 2014 WL 491272, at *2 (N.D. Cal. Feb. 4, 2014) ("In 2002, the Ninth Circuit held that under California law, police officers cannot

---

[10] As will be discussed below, other than the observation of defendant Alvarez's vehicle actually crossing the right lane line by approximately ten inches onto the rumble strip, these facts are remarkably similar to those presented in this case.

8

pull over a driver for swerving unless it is both pronounced and continues over a 'substantial distance.' . . . The evidence in this case provides even less justification for a traffic stop than the facts in *Colin*. Here, the Fiat remained on the white line for at most two seconds before swerving back into its lane. Its tires may also have briefly crossed over the lane line. This is neither the "pronounced weaving" nor the weaving for a "substantial distance" required to initiate a traffic stop.") (citing *Colin*, 314 F.3d at 446).

On the other hand, the Ninth Circuit in other cases has concluded that a vehicle's straddling of a lane or crossing a lane line, especially if combined with other observations or factors does provide reasonable suspicion justifying a vehicle stop. Thus, in *United States v. Garcia*, 205 F.3d 1182 (9th Cir. 2000), the officer observed the vehicle "swerving slightly within its lane, not breaking the lane lines," which he believed indicated "a pattern of an intoxicated driver or tired driver." 205 F.3d at 1184. Thereafter, the vehicle was observed crossing the lane line and then moving back into its lane and, a few hundred yards later, cross the center yellow line into the paved shoulder and then jerk back into its lane. *Id*. The subsequent vehicle stop resulted in the seizure of controlled substances and the defendant's motion to suppress was denied. On appeal the Ninth Circuit held that the vehicle stop was reasonable, observing merely:

> Garcia does not dispute that the vehicle was weaving within its lane or that it later crossed onto the shoulder of the highway. [The trooper] had probable cause to pull the vehicle over based on its failure to maintain a single travel lane, in violation of Nev. Rev. Stat. § 484.305.

Id. at 1187.

In *United States v. Fernandez-Castillo*, 324 F.3d 1114 (9th Cir. 2003), state transportation workers reported to police that a car was driving erratically.[11] When an officer found the car on the highway he observed the driver sitting very close to the steering wheel, which in the officer's experience indicated impaired driving, and then saw the car "drift" within its lane of travel from one side of the lane to the other. *Id*. at 316. The officer then stopped the vehicle even though he

---

[11] What the workers had observed was a turn signal blinking without the car changing lanes, the car straddling two lanes for a time, crossing the yellow line that ran along the median at one point, drifting across the fog line onto the shoulder and then moving back to the center with its wheels touching the middle line again. 324 F.3d at 1115–16.

had observed no traffic violation because they were entering a section of the road with two way traffic and the officer concluded it would be safer to make the stop before entering that area. *Id.* Based upon the totality of the circumstances, the report by transportation workers of erratic driving in addition to the officer's own observations, the court concluded that the investigatory stop of the vehicle was constitutional. *Id.* at 1121;[12] *see also United States v. Perez,* 37 F.3d 510, 513 (9th Cir.1994) ("[The officers] observed Perez's van pass them and weave back and forth across the fog line. The officers testified that they thought the van's driver was possibly either intoxicated or falling asleep at the wheel. As it turned out, the van's steering was malfunctioning. Whatever the cause, the officers' decision to stop the van was one any reasonable highway patrol officer would make."), overruled on other grounds as recognized in *United States v. Mendez,* 476 F.3d 1077 (9th Cir. 2007); *United States v. Thomas*, 468 Fed. Appx. 714, at *1 (9th Cir. 2012)[13] ("For some two miles, [the officer] saw Thomas driving significantly below the speed limit on an open highway, which was unusual for the area, and driving on and over the "fog line"—the painted line separating the edge of the lane from the shoulder of the road. While not rising to the level of probable cause to arrest, these observations afforded [the officer] sufficient reason to stop the vehicle and investigate whether the driver was possibly fatigued or under the influence.")

California courts have, arguably, been even more consistent in concluding that an officer's observations of weaving, even within the boundaries of a lane, and/or otherwise erratic driving constitute reasonable suspicion warranting a traffic stop. *See People v. Wells*, 38 Cal. 4th 1078, 1083–84 (2006) (anonymous tip of a possibly intoxicated driver "weaving all of the roadway" established reasonable suspicion justifying stop); *Arburn v. Department of Motor Vehicles*, 151 Cal. App. 4th 1480, 1484–85 (2007) ("More than one California court has found that "weaving"

---

[12] The court also observed: "Our decision in *Colin* expressly left open the possibility that 'pronounced weaving' or weaving for a 'substantial distance' might give rise to a reasonable suspicion that the driver of the weaving car is intoxicated, thereby justifying an investigatory stop – even though the officer does not observe the driver commit a traffic infraction." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1120 (9th Cir. 2003)

[13] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

10

within a lane provides sufficient cause to conduct an investigatory stop. . . . Weaving within a lane is a widely recognized characteristic of an intoxicated driver and recognizing a weaving driver is undoubtedly within the province of even the most junior officer."); *People v. Russell*, 81 Cal. App. 4th 96, 99–105 (2000) (a vehicle "repeatedly drift[ing] around within its lane and sometimes out of its lane" over three miles justified the vehicle stop); *People v. Bracken*, 83 Cal. App. 4th Supp. 1, 4 (2000) (officer with over five years of experience and who had been qualified as an expert in cases involving driving under the influence had reasonable suspicion supporting a stop where he observed a vehicle weaving within its own lane for approximately one half of a mile).

As noted above, the most significant difference between the facts of this case and those confronted by the court in *Colin*, is that here the officer observed the vehicle cross over the right lane line by ten inches onto the bumper strip whereas in *Colin* the vehicle was observed driving on the lane lines, both left and right, without crossing outside those lines. In addition, here Officer Pratt testified that he pulled the vehicle over because by crossing the lane line onto the shoulder it appeared the driver was having difficulty negotiating a turn which, in his significant DUI arrest experience, was particularly indicative of driving under the influence. The question is, are these differences in the facts legally significant and do they provide a basis from distinguishing this case from that presented in *Colin*? The court views that as a very close question, but concludes that the facts of this case are distinguishable from those in *Colin*. Based upon the other Ninth Circuit and California cases discussed above, the court finds that based upon Officer Pratt's observations there was a reasonable suspicion that defendant was driving while intoxicated thereby justifying the vehicle stop.[14]

---

[14] The court pauses to note the circumstances that play little or no role in its determination. Officer Pratt identified several additional elements adding to his suspicion: that it was 11:57 p.m., that the vehicle was traveling 60 mph in a 65 mph maximum speed zone, and that there had been a fatal crash DUI crash two months earlier on the same stretch of highway. (Doc. No. 32 at 56–59.) As to the time of night, the court notes that the incident in *Colin* took place at 2:05 a.m. and thus this fact plays no role in distinguishing the holding in *Colin*. As to the driving at 60 mph in a 65 mph maximum speed zone, one would be hard pressed to conclude that reasonable suspicion of criminal activity stems from a driver *obeying* the law in this fashion and Officer Pratt essentially conceded as much. (Doc. No. 32 at 34, 57.) Moreover, that a fatal DUI crash two

### 2. *Officer Pratt Did Not Unreasonably Prolong the Stop*

As the Supreme Court has recently explained, the acceptable duration of a police detention in the context of a traffic stop is determined by the seizure's "mission," i.e. the reason the traffic stop was permissible under the Constitution in the first place. *Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1614 (2015). If the reason for a stop is to address a traffic infraction, the stop may "last no longer than is necessary to effectuate th[at] purpose." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1985)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). An officer may, however, extend a traffic stop if the extension itself is independently supported by reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (citing *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007)). Thus, the extension of a traffic stop requires the officer to be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

Here, Officer Pratt had independent reasonable suspicion for prolonging the traffic stop. He noted that the fact that the car was registered to one person and insured to another, neither of whom were the defendant, was a prominent indicator of narcotics trafficking. (Doc. No. 32 at

---

months prior on a highway as heavily trafficked as Highway 99 provides essentially no support for a reasonable suspicion of criminal activity. However, it is also the case that the officer's failure to ask the defendant if he'd been drinking or to administer field sobriety tests does not invalidate the officer's initial reasons for stopping the vehicle. It was clear from his evidentiary hearing testimony that Officer Pratt was looking for a reason to pull defendant's vehicle over. (*Id.* at 53.) However, the Supreme Court has held that the constitutional reasonableness of a traffic stop does not depend on the actual motivation of the officer involved. *Whren v. United States*, 517 U.S. 806, 813 (1996) (and cases cited therein); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (noting an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"); *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("If . . . the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense."); *cf. United States v. Magallon-Lopez*, 817 F.3d at 677–78 (Berzon, CJ, concurring). Thus, it is of no import that Officer Pratt's actual motivation for stopping defendant's vehicle may be subject to question.

14–15.) Further, the defendant did not know who owned the vehicle, which the officer found to be "very significant." (*Id.* at 15.) Also significant to the officer was the fact that only a single key was in the ignition. (*Id.* at 14.) Officer Pratt testified that these observations, combined with his extensive training and experience in narcotics interdiction, led him to believe the defendant "may be transporting narcotics." (*Id.* at 15–16.) Officer Pratt's identification of these indicia of narcotics trafficking occurred "within 20, 30 seconds" of his initiating contact with the defendant, at which time the officer's focus shifted to "a narcotics stop." (*Id.* at 18–19.) After he removed the defendant Alvarez from the car and continued talking with him, defendant Alvarez stated that he also did not know who had brought the vehicle to him. (*Id.* at 20.) Though he advised Officer Pratt that the vehicle had been dropped off to him at his uncle's request, defendant Alvarez was unsure of his uncle's name. (*Id.*) These facts[15] were sufficient to give rise to a reasonable suspicion of narcotics trafficking, which justified prolonging the stop for further investigation. *Evans*, 786 F.3d at 788; *see also United States v. Browne*, CR 16-27-M-DLC, 2016 WL 6602636, at *7 (D. Mont. Nov. 8, 2016) (concluding that there was a reasonable suspicion of drug smuggling, justifying prolonging of a traffic stop to allow for a canine sniff of the vehicle to confirm or dispel that reasonable suspicion and that prolongation of the stop did not violate the Fourth Amendment under these circumstances).

        *3.     The Search Was Consensual*

It is generally presumed a warrantless search is unreasonable, and therefore violates the Fourth Amendment, unless it falls within a specific exception to the warrant requirement. *Riley v. California*, __ U.S.__, __, 134 S. Ct. 2473, 2482 (2014) (citing *Kentucky v. King*, 563 U.S. 452 (2011)). "Warrantless searches by law enforcement officers 'are *per se* unreasonable under the

---

[15] Although Officer Pratt found defendant's possession of a cell phone and a few convenience store items to be of some slight significance in concluding that he might be transporting narcotics (Doc. No. 32 at 14–15), the court has afforded no weight to these facts in assessing whether a reasonable suspicion existed. While the court is aware that there may be "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot," *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)), the possession of a cell phone and a few convenience store items simply does not weigh for or against Officer Pratt's reasonable suspicion of narcotics trafficking, in that they are innocuous items of exceeding commonality.

13

Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The consent exception requires the individual to give "voluntary and intelligent consent to a warrantless search of his person, property, or premises." *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000) (quoting *United States v. Torres-Sanchez*, 83 F.3d 1123 (9th Cir. 1996)). Consent to a search may be withdrawn or limited at any time. *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). "In order to establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997) (citing *Schneckloth*, 412 U.S. at 222); *see also United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012).

Here, defendant Alvarez argues his consent to the search of the vehicle he was driving was not freely and voluntarily given for two reasons. First, he was told by Officer Pratt that if he refused to consent, the officer would prolong the stop to await the arrival of a canine unit to the scene. (Doc. No. 24 at 9.) Second, he contends that his consent was not voluntary because the officer induced him to believe he had no right to withdraw his consent, once it was given. (*Id.*) The court finds neither argument persuasive.

First, it is true that **if** Officer Pratt represented to defendant Alvarez that he had the legal authority to perform the proposed search regardless of his consent in order to induce the giving of consent to search by the defendant, the consent would be invalid. *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."); *see also Schneckloth*, 412 U.S. at 225; *United States v. Bautista*, 362 F.3d 584, 589, 591-92 (9th Cir. 2004) ("Notably, however, 'the government's burden to show voluntariness cannot be discharged by showing no more than acquiescence to a claim of lawful authority.'"); *Orhorhaghe v. I.N.S.*,

14

38 F.3d 488, 500–01 (9th Cir. 1994) ("It is well established that there can be no effective consent to a search or seizure if that consent follows a law enforcement officer's assertion of an independent right to engage in such conduct."). Here, however, the evidence establishes that CHP Officer Pratt did not suggest in any way that he had the legal authority to search the car, particularly the trunk.[16] Rather, the officer told defendant Alvarez merely that he would prolong the vehicle stop for long enough to allow for a dog sniff of the car to take place. (Doc. No. 32 at 24.) The court has already concluded above that, based on the indicia of narcotics trafficking noted by Officer Pratt, there was a reasonable suspicion justifying the prolonging of the stop in order to subject the car to a dog sniff. *See Evans*, 786 F.3d 788.

Regarding defendant's second argument, the Ninth Circuit has noted that law enforcement officers violate the Fourth Amendment when they coerce defendants into believing they have no authority to withdraw their consent to a search. *McWeeney*, 454 F.3d at 1036. This is a factual determination, which looks to "whether the officers created a setting in which the reasonable person would believe that he or she had no authority to limit or withdraw their consent." *Id*; *see also United States v. Gonzalez*, 412 Fed. App'x 967, at *1 (9th Cir. 2011). Specifically, the Ninth Circuit has observed:

> Under this analysis, the district court must determine whether the officers' conduct is objectively recognizable as intimidation directed mostly (or exclusively) at coercing [the defendant] into believing that [he] had no right to withdraw or delimit [his] consent once it was given, and whether a reasonable person faced with the officers' conduct would have believed that no such right existed.

*McWeeney*, 454 F.3d at 1037.

Here, the evidence before the court establishes that after receiving consent from defendant Alvarez to search the car, Officer Pratt told the defendant that he was very good at narcotics interdiction, that he knew there were drugs in the car, that he was going to find the drugs, and that he would only give Alvarez one chance to tell the truth and then "all bets are off." (Doc. No. 32

---

[16] In fact, CHP Officer Pratt advised Alvarez of exactly the opposite, noting that Alvarez had the constitutional right to refuse a search and that he would not search the vehicle without his consent. (Doc. No. 32 at 24.)

15

at 25, 47.) When the defendant was then asked if there were drugs in the car, he advised there was a bag in the trunk. (*Id.* at 25.) Nothing about this exchange indicates coercion which would have reasonably lead defendant Alvarez to believe he did not have the right to withdraw his consent to search. While the tactics used by the officer were a form of psychological pressure to convince the defendant that declining to tell the officer of the presence and location of drugs in the car would ultimately be fruitless, the officer's statements were not directed in any way to creating a setting in which defendant Alvarez would reasonably believe he had no authority to limit or withdraw his consent to the search. Therefore, the consent was valid.

**Conclusion**

For all of the reasons stated above, defendant's motion to suppress evidence (Doc. No. 20) is denied.

IT IS SO ORDERED.

Dated: __**December 22, 2016**__          _____
                                                           UNITED STATES DISTRICT JUDGE